[Crim. No. 1609. Second Appellate District, Division One.—May 4, 1928.]

THE PEOPLE, Respondent, v. LEONARD KEEL, Appellant.

Frederic H. Vercoe, Public Defender, and G. A. Benedict, Deputy Public Defender, for Appellant.

U. S. Webb, Attorney-General, and John L. Flynn, Deputy Attorney-General, for Respondent.

WOOD (W. J.), J., *pro tem.*—Defendant was accused of the murder of Reuben Brice and was convicted of manslaughter. He appeals from the judgment and from an order denying his motion for a new trial. About midnight of September 3, 1927, a number of people of both sexes were attending a party at 1236 East Twenty-fifth Street, in the city of Los Angeles, at which the guests were dancing. Defendant arrived late at the party in company with Mrs. Gertrude Simpson. He objected to her dancing with two of the men present, McAfee and Brice. Later an altercation took place in the street in front of the house and a fight ensued, in which a number of men were engaged and in which several were cut. In the course of the fight Brice received a cut which caused his death. Statements of the various witnesses as to what occurred at the time of this trouble are in hopeless conflict. They differ as to the number and location of the "fights," the number of participants therein and the part taken by each participant. Not only did the eye-witnesses contradict each other, but most of them, if not all, gave testimony in conflict with their own sworn statements. No witness could swear that he saw the first blow struck in the fight or the actual cutting of Brice. As we search further and further into the record it becomes increasingly difficult to discover what actually occurred on this fatal night.

Appellant vigorously maintains that the trial court erred to his prejudice in refusing to allow counsel to argue to the jury the question of self-defense and in failing to instruct the jury on this subject. To properly pass upon this point a consideration of the evidence in some detail is necessary. The prosecution relied mainly upon the statement of the witness Blalock, who accompanied Brice to the party, and who testified, in brief, that he saw defendant pulling away from Mrs. Simpson in front of the house; that Mrs. Simpson was trying to detain him; that defendant went across the street and in a few minutes witness heard somebody "holler, 'Fight!' "; and he looked across the street and saw defendant and Brice standing behind an automobile; that defendant "made a pass" at Brice with

his hand and Brice jumped back; that defendant chased Brice back and forth across the street; that Brice picked up an automobile jack which was lying on the sidewalk and threw it at the defendant, but missed him; that defendant "ran back about ten feet down the sidewalk from Brice"; that Brice "might have made one or two steps ·forward"; that defendant, using the words of the witness, "put his hand in his coat pocket, and got something, I don't know if it was a knife or a razor, but . . . I could see the blade shine"; that defendant ran after Brice; that "they went around and around the trees, and finally Mr. Keel caught Brice and of course they locked and fell; that is as far as I could tell about it"; that defendant got up and ran; that Brice was lying in the street covered with blood. It was stipulated that at the preliminary examination Blalock had testified: "Mr. Brice turned after he dodged the lick and ran after Mr. Keel. Mr. Keel ran for about five feet into the open. So, at the time that Mr. Keel opened the knife, Mr. Brice was after him. Sure, he had run, yes."

Witness Mrs. Simpson testified that Brice and McAfee were dancing improperly and that defendant had told her not to dance with either of them; that they asked her to dance but she refused; that McAfee then said to Brice: "Give me your knife and I will go out and cut that black —— — — —— heart out"; that Brice gave McAfee the knife, which was open, saying, "Go on, boy, I am with you;" that several more said "I am with you" and that all went out; that while defendant was in the middle of the street five or six people, including Brice, McAfee, and Blalock secured automobile tools from the rear of a car standing on the north side of the street and threw them at defendant, who picked up the tools and threw them back. The witness further testified: "When Keel would pick things up and throw them back, they would chase Keel around the cars from the north side of the street to the other side of the street, and then they ran around the cars and threw the—and threw these tools at Keel, and Keel would pick them up and throw them back across, and then they went to some trees. Q. By the Court: Who started running for the trees first? A. Keel. They started throwing things at him, and he got the pump and

ran to the trees and was dodging around the trees with the pump in his hand, and hitting at the other five or six with Keel. Q. When you say 'five or six with Keel,' you mean six including Keel, A. Yes, including Keel. Q. Tell us what happened at the trees? A. Then the boys would hit at Keel and Keel would hit at them with the pump he had, and they chased all around the trees, and finally one of the boys, I don't know which one it was, picked up a piece of iron, or something—it was one of the tools that was thrown out of the car—and hit Keel, struck Keel across the head. . . . And I screamed and said, 'Oh, don't you do that; you boys quit,· some of you people help me stop these boys from fighting,' and they all ran away and left me, and they would not stop, and this short fellow that they said was Brice—I don't know his name at· all; I only knew since I was here—but this fellow picked up a big piece of something and struck Keel in the side and knocked him down, and then the other boys fell on him, and then I screamed and ran in the house and called the policemen to come.'

Witness Mary Smith testified: 'I was getting ready to go home, and I saw a bunch there across the street by a machine. Q. A bunch of what? A. I saw some people by a machine. Q. What were they doing? A. It seemed as if they were just standing about around the machine over there, and pretty soon I saw them running out into the street from the machine, coming over to this side, from the north side over to the south side of the street. Q. How many ran over there from the north side? A. It looked like five or six. Q. Where did they run? A. Over near the church between the two trees. Q. Are those trees on the south side or north side of the street? A. I don't know. Q. Well, are they on the side of the street Mrs. Fields' house is on? A. Yes. Q. What did you see around those trees? A. I saw Mr. Keel. He had a pump in his hand. He was running and Reuben was after him. Q. Whom do you mean by Reuben; Reuben Brice? A. Yes, the deceased. Q. That is the man who is dead? A. Yes, sir. Q. Who was running after who? A. ·After Mr. Keel. Q. Reuben Brice was running after Mr. Keel? A. Yes, sir. Q. Then, tell us what happened. A. So Mr. Keel threw the pump, and I was coming along by the curbing

and he threw the pump, and the handle of the pump hit me on the leg as I was coming, and in some way he fell down on the ground. Q. Who fell down on the ground? A. Keel, and Reuben jumped on top of him. Q. By Reuben, you mean Reuben Brice? A. Yes, sir. Q. The man who is now dead? A. Yes; he jumped on top of him, and I saw Mr. Keel doing that way to him (indicating) doing that way to Reuben Brice, the deceased. Q. At that time where was Mr. Brice? A. Mr. Brice was on top of Mr. Keel, and he was on his back on the ground between the two trees, and so he stayed there, I guess, about 15 minutes on the ground, and when he got up I saw some drops of blood on the sidewalk, but I thought the blood came from some one with the nose bleed. Q. Never mind what you thought. Tell us what you saw. A. I saw some blood. Q. By the Court: Who stayed on the ground about 15 minutes? A. Keel and Reuben Brice. Q. And Reuben Brice all the time on top? A. Yes sir. Q. Were they going through some motions, or doing anything; what did you see? A. He was doing like this (indicating). Mr. Benedict: Raising her doubled hands up and down from the ribs to the height of her head several times. Q. By Mr. Dennison: By 'he' whom do you mean? Q. By the Court: How was he on top, straddle of him? A. Yes. Q. Like you straddle a horse? A. Yes. Q. What else was Brice doing? A. Brice had, it seemed like he had his arms or something around his head, as much as I could see. It was dark, but I could see that Keel looked like he was doing that way (indicating). Q. Trying to get loose? A. I don't know. Q. Did he get loose? A. Well, finally he did. Q. By Mr. Benedict: Then, what did he do? A. He ran back in between this driveway over back across the street.''

Witness Annie Fields gave the following testimony: ''You went down there and saw Mr. Keel leaning against this tree and saw this (automobile pump) in his hand. Tell us what happened, what you did and what you saw, in your own words? A. When I walked up to him and put my hand on him I saw he had this thing in his hand, and I said, 'What are you boys doing out here,' and he said, 'You go on back in the house, Mrs. Fields,' and I said, 'I just think this is just terrible for you boys to come and act like this,' and he said, 'You go back in the house,

I am not going to let these boys kill me,' and I walked away from him a little ways, and I looked around and I saw another boy come across the street, a boy or a man, I don't know whether it was a boy or a man—a boy came across street and jumped on him, and they went to the ground and wallowed over and over under this tree, and I left then and walked pretty brief to the sidewalk, to the entrance of my house, and this Mr. Lee ran across the street and said, 'Mrs. Fields, I am cut, can't you take me to a doctor,' and I said, 'Before I could get my car out and take you to the Doctor, you would bleed to death. You go in any of those cars over there to the doctor,' and he ran away and I went in the house.''

The defendant was sworn as a witness and testified that McAfee had come out of the house with a knife directly toward him "mumbling something" which he could not understand; that he ran toward the street between two cars; that a man threw a "jack" at him; that someone came across the street and hit him over the eye. He further testified: ''Shortly afterwards the other bunch followed and some man struck me in the side and knocked me down. Q. Did they hit you anywhere else in the meantime? A. Well, they hit me several licks, hit me on the arm, and another lick in my head. Q. Where did that land? A. Right at my forehead. Q. In the middle of the forehead? A. Yes. Q. Indicating the middle of the forehead at the edge of the hair. Go ahead. A. They knocked me down there and by struggling and crawling on my hands and feet I got up and got away from them and ran back toward the north side of the street. After I got across to the north side of the street there was two men who followed me clean to the place, to the fence, and I didn't know it was there at that time.'' Defendant denied that he cut Brice. Dr. Faubion, a police surgeon who examined defendant, testified: ''At the time the patient, now the defendant, had an abrasion on the forehead on the left side upper region, and also one laceration an inch and a half long in the forehead.''

The denial by defendant of the act of cutting Brice did not deprive his counsel of the right to demand that instructions on the law of self-defense be given to the jury if the justification therefor appeared elsewhere in the evidence. This is conceded by the attorney-general, who, in

the proper spirit, gives us the following quotation from 13 Ruling Case Law, 813: "Whether it is the duty of the court in a prosecution for homicide to instruct the jury on the question of self-defense when defendant denies the killing, seems to depend entirely upon the nature of the evidence introduced at the trial. If the defendant denies the killing and there is no evidence adduced by either party which tends to show that the killing might have been in self-defense, although other evidence shows quite conclusively that the defendant committed the crime, it is not the duty of the court to instruct as to self-defense; but if the evidence tends to raise the issue of self-defense although the defendant denies the killing, it seems that an instruction based on the theory of self-defense is proper and should be given. His denial of the act does not necessarily warrant the trial court in refusing to give an instruction based on the theory of self-defense." In *People* v. *Degnen*, 70 Cal. App. 567, 591 [234 Pac. 129, 139], the court said: "And we can conceive of no reason why such evidence is inadmissible in a case in which the defendant contends, as appellant here contended at the trial, that he committed no lascivious assault whatever upon the prosecutrix. The two principal elements of the rape are, first, the commission of the act, and, second, the lack of consent of the victim to its commission. The burden is upon the People to prove both these elements, of course, and it is inconceivable that the defendant may not offer proof to rebut the evidence introduced by the prosecution in support of each of the two branches of the case. In civil actions it is the well-established rule, expressed, in fact, in the statute (Code Civ. Proc., sec. 441), that a defendant 'may set forth by answer as many defenses . . . as he may have'; and it is well settled that the terms of the section permit the allegation of inconsistent defenses (*Calexico Lumber Co.* v. *Emerson*, 54 Cal. App. 239 [201 Pac. 612]). These, of course, are rules of pleading, but a similar rule, as a matter of evidence and independent of statute, would seem necessarily to apply in criminal cases under the issue presented by a plea of not guilty."

Applying the rule set forth in Ruling Case Law, *supra*, we are confronted with the question, Does the evidence tend to raise the issue of self-defense? A discussion of the

evidence hereinabove referred to is unnecessary to convince that the jury, as reasonable men and women, might have found that defendant was justified in cutting Brice in the manner shown if the law of self-defense had been explained to them. If the testimony of any witness in the case is sufficient to raise the issue, it should be presented to the jury. Evidence was presented to the effect that defendant was threatened by McAfee with an open knife, that he was assaulted by several men with automobile tools and that he was struck on the head with a heavy instrument which laid open his scalp. He is entitled to have the jury decide whether the cutting of Brice under the circumstances was justifiable in law.

Our disposition of the question of self-defense makes it unnecessary to discuss other points raised by appellant.

The judgment and order denying defendant's motion for a new trial are reversed.

Houser, Acting P. J., and York, J., concurred.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 2, 1928.

All the Justices present concurred.