EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.*
OSVALDO PÉREZ MARTÍNEZ, acusado y apelante.

*Número:* 16624   *Resuelto:* 18 de diciembre de 1961

182

*Práxedes Alvarez Leandri* y *Roberto Davis Vázquez,* abogados
del apelante; *J. B. Fernández Badillo, Procurador General,* y
*Arturo Estrella, Sub Procurador General,* abogados de El
Pueblo, apelado.

Sala integrada por el Juez Asociado señor Pérez Pimentel como
Presidente de Sala y los Jueces Asociados señores Santana
Becerra y Rigau.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión
del Tribunal.

Osvaldo Pérez Martínez fue acusado conjuntamente con
otros nacionalistas de un delito de asesinato en primer grado
perpetrado en la persona del Cabo de la Policía de Puerto
Rico, Aurelio Miranda, el día 30 de octubre de 1950 en Ponce.
Un jurado le declaró convicto de Asesinato en Segundo Grado.

En apelación revocamos la sentencia que se le impusiera y ordenamos la celebración de un nuevo juicio. (¹) Este se celebró ante otro jurado siguiéndose el proceso bajo la acusación original por el delito de Asesinato en Primer Grado. El jurado rindió veredicto declarando al acusado culpable de Asesinato en Segundo Grado. Una vez sentenciado interpuso el presente recurso de apelación señalando la comisión de varios errores, el primero de los cuales, lo enuncia así:

"Cometió grave error el Tribunal Superior de Puerto Rico, Sala de Ponce, al juzgar al acusado apelante por el delito de asesinato en primer grado nuevamente habiendo sido él previamente convicto y sentenciado por un delito de asesinato en segundo grado, por los mismos hechos, sentencia que fue revocada por este Hon. Tribunal en el caso Criminal número 15,845."

En el recurso de Hábeas Corpus Núm. 773, de *José Velázquez Álvarez* v. *Gerardo Delgado*, resuelto por nosotros en 25 de junio de 1958, adoptamos la doctrina del caso de *Green* v. *United States*, 355 U.S. 184, 2d L. ed. 199. (²) Resolvimos que cuando un acusado de asesinato en primer grado es convicto de asesinato en segundo grado y luego a instancias suyas se anula el veredicto y se ordena la celebración de un nuevo juicio, el acusado no puede ser convicto del delito original de asesinato en primer grado y que una convicción por este delito en el nuevo juicio, viola el principio de la exposición anterior (*former jeopardy*). En su consecuencia anulamos la sentencia impuesta a Velázquez Álvarez por el delito de asesinato en primer grado y ordenamos que se siguiera el proceso por el de asesinato en segundo grado. (³)

---

(¹) Una instrucción errónea transmitida al jurado sobre la defensa de coartada sirvió de fundamento a la revocación de la sentencia.

(²) En esencia se resuelve en el caso de *Green* que el veredicto de asesinato en segundo grado era una absolución implícita del delito de asesinato en primer grado, que era el delito por el cual se le perseguía; que el jurado tuvo oportunidad de declararle culpable de asesinato en primer grado pero que no lo hizo y al ser disuelto dicho jurado sin su consentimiento Green quedó protegido por la cláusula constitucional de doble exposición en cuanto al delito de asesinato en primer grado.

(³) Al resolver el caso de *Velázquez Álvarez*, dejamos sin efecto nuestra jurisprudencia anterior que se pronunciaba en sentido contrario. *Pueblo*

Tanto en el caso de *Green* como en el de *Velázquez Alvarez*, el veredicto rendido en el nuevo juicio declaró culpable a los acusados del delito mayor, esto es, de asesinato en primer grado cuando ya otro jurado anteriormente les había absuelto implícitamente de dicho delito al declararles culpables del delito de asesinato en su grado menor de segundo grado, o cuando ya en virtud de la disolución del jurado que rindió dicho veredicto, sin consentimiento de los acusados y sin que concurrieran otras circunstancias extraordinarias, habían quedado protegidos por la garantía constitucional contra doble exposición.

En el presente caso, sin embargo, el veredicto rendido en el primer juicio y el rendido en el nuevo juicio fue el mismo: culpable de asesinato en segundo grado. El primer veredicto, habiendo sido anulado a instancias del acusado, no constituye una exposición anterior. El acusado podía ser legalmente castigado por el delito de asesinato en segundo grado en el segundo juicio, sin que ello violara su derecho constitucional o/a no ser puesto en riesgo de ser castigado dos veces por el mismo delito. Véase el caso de *Green*, supra, y la extensa anotación en 61 A.L.R.2d 1141.

El apelante se queja, sin embargo, de que el error cometido por el Tribunal Superior al enjuiciarlo por segunda vez por un delito de asesinato en primer grado, le fue perjudicial. Discrepamos. En ocasiones anteriores hemos dicho que el asesinato constituye un solo delito que se divide en grados en atención a la perversidad demostrada por el acusado y al solo efecto de la imposición de la pena. *Pueblo* v. *Ortiz*, 62 D.P.R. 258 y *Pueblo* v. *Colón*, 65 D.P.R. 760. La diferencia entre los dos grados del asesinato consiste en que en el asesinato en primer grado la muerte se realiza con malicia premeditada y deliberada mientras que en el de segundo grado la muerte es maliciosa y premeditada pero sin que medie deliberación. *Pueblo* v. *Blanco*, 77 D.P.R. 767. Siendo

---

v. *Carbonell*, 36 D.P.R. 526, 761; 27 F.2d 253; *Pueblo* v. *Colón*, 65 D.P.R. 760; *Pueblo* v. *Vázquez*, 68 D.P.R. 67.

la deliberación un acto subjetivo del acusado, no puede probarse con evidencia directa y es preciso, por tanto, recurrir a los hechos del caso para determinar si de ellos puede racionalmente inferirse la deliberación. *Pueblo* v. *Rosario*, 67 D.P.R. 371. Es lógico concluir que la prueba para sostener una convicción por el delito de asesinato ya sea en uno u otro grado, es generalmente la misma. En el presente caso, por lo menos, era la misma. Por consiguiente, el apelante no se vió obligado a enfrentarse a una prueba que fuera extraña al delito por el cual se le condenó y que por tal razón se perjudicaran sus derechos.

Por otro lado, sostener que de haberse seguido el proceso por el delito de asesinato en segundo grado, el jurado hubiera tenido oportunidad de escoger únicamente entre dicho delito y el de homicidio voluntario, nos parece un tanto especulativo y en su consecuencia una base muy débil para reclamar perjuicio, bajo la asunción de que en tal caso el jurado se hubiera decidido por declarar al acusado culpable de homicidio voluntario. En ausencia de una demostración en contrario, presumimos que el jurado, en el cumplimiento de su deber, consideró toda la prueba presentada por las partes y que a la luz de las instrucciones trasmitidas por el juez, que cubrieron el asesinato en sus dos grados y el homicidio voluntario, llegó libremente a la conclusión de que el apelante había comedito el delito de asesinato en segundo grado. A igual conclusión había llegado el jurado del primer juicio, rindiendo veredicto condenatorio de asesinato en segundo grado.

El primer error, por tanto, no fue cometido.

El segundo error carece de mérito. El veredicto del jurado está ampliamente sostenido por la prueba. La muerte del Cabo Miranda no se produjo con ocasión de un arrebato de cólera o súbita pendencia como alega el apelante. El día 30 de octubre de 1950 el apelante viajaba en unión a otros nacionalistas, entre ellos Ramón Pedroza, en un automóvil público marca Chevrolet por la calle Arenas de Ponce en di-

rección de Este a Oeste. Se encontraron con el coche celular de la policía que bajaba de Norte a Sur por la calle León. Este coche lo conducía el policía Pascual Pagán y le acompañaba el cabo Aurelio Miranda. Persiguieron el automóvil ocupado por los nacionalistas por la carretera que conduce de Ponce a Adjuntas, dándole alcance cerca de la Planta de Cemento de Ponce. Le ordenaron que se detuvieran y así lo hicieron. El coche celular se detuvo delante de ellos, bajándose el cabo Miranda y dirigiéndose al conductor del auto ocupado por los nacionalistas le preguntó hacia dónde iban. [4] El chófer contestó que iban para Adjuntas y entonces el Cabo Miranda le dijo al policía Pagán "vamos a echarlos a la 'patrol' ". Pedroza preguntó al cabo Miranda "¿qué usted dijo cabo?" e inmediatamente le hizo un disparo con un arma de fuego, cayendo Miranda sobre el pavimento. Abandonaron el vehículo los nacionalistas, entre ellos el apelante armado de un arma de fuego. Pedroza se acercó al cabo Miranda y le hizo dos disparos más, uno por la espalda y el otro por el cráneo y luego lo despojó de su revólver de reglamento. Pagán se parapetó en la puerta del "patrol" cerca del guía y los nacionalistas le hacían disparos. Llegaron otros policías que prestaban servicio frente a la planta de cemento. Los nacionalistas también le dispararon a estos policías mientras corrían hacia un monte.

En una confesión escrita del apelante, que fue admitida en evidencia, éste declara que ellos iban para Peñuelas. Se le pregunta "¿Qué pasó cuando la guagua de la policía los detuvo a ustedes cerca de la fábrica de cemento en Ponce?" Contesta: "Tuvimos que abrir fuego, tuvimos que disparar contra los que iban en la Police Patrol." Declara además, que disparó tres tiros contra el policía que custodiaba la

---

[4] El policía Pagán declaró en la repregunta que el Cabo Miranda se bajó de la "patrol" con su revólver en las manos. Luego en el examen redirecto afirmó que Miranda al dirigirse al auto ocupado por los nacionalistas no llevaba armas en las manos.

planta de cemento, mientras el testigo iba huyendo; que los nacionalistas iban a atacar a los cuarteles de la policía en todos los pueblos; que el grupo dirigido por Pedroza, al cual pertenecía el apelante, tenía la misión de atacar el cuartel de la policía de Ponce. Explica que aunque se dirigían a Peñuelas, donde se sabía había ocurrido un tiroteo, se vieron precisados a dirigirse hacia Adjuntas porque la policía los desvió; en el automóvil llevaban armas y bombas.

La teoría de defensa del apelante fue la coartada. El trató de probar, sin éxito, que en el momento de ocurrir la muerte del Cabo Miranda él se encontraba en otro sitio.

Es insostenible el argumento de que la muerte del Cabo Miranda fue ocasionada con motivo de una súbita pendencia o arrebato de cólera. Los nacionalistas, en un plan concertado iban a atacar los cuarteles de la policía. El apelante y otros iban a atacar el cuartel de Ponce. Trataron de ir primero a Peñuelas, donde ya se sabía de un tiroteo. Al descubrir la presencia del coche celular de la policía se desviaron hacia Adjuntas y al ser interceptados cerca de la Planta de Cemento de Ponce, por la policía, abrieron fuego contra ésta, con el propósito incuestionable de que la policía no frustrara sus planes. No hubo arrebato de cólera, ni súbita pendencia. Lo que hubo fue la ejecución de un plan previamente calculado, la realización del designio común de atacar a los cuarteles y por supuesto a la policía. La muerte del Cabo Miranda fue maliciosa y premeditada. Así lo resolvió el jurado y no hay base alguna en el récord para anular su veredicto. Véase *Pueblo v. Cortés*, 79 D.P.R. 818; *Pueblo v. Ortiz*, 68 D.P.R. 681; *Pueblo v. Sarria*, 57 D.P.R. 882; *Pueblo v. Torres*, 75 D.P.R. 231; *Pueblo v. Blanco*, 77 D.P.R. 767.

█ El tercer señalamiento, al efecto de que el jurado apreció erróneamente la prueba, es frívolo. En el récord hay abundante prueba, incluyendo la confesión del apelante, según señala el Procurador General, que establece la presencia del acusado en el sitio de los hechos y su participación en los

mismos. Una vez creída esa prueba por el jurado, el detalle de cuantas personas iban en el vehículo de los nacionalistas y la posición que éstos ocupaban en el mismo, carece de importancia. El jurado, por otro lado, no dio crédito a la prueba de coartada presentada por el acusado y su actuación no la revocaremos en apelación. *Pueblo* v. *Morales,* 79 D.P.R. 605.

Por el cuarto señalamiento se imputa error al Tribunal Superior al denegar la instrucción solicitada por la defensa relativa al arresto ilegal y a la oposición que se puede ofrecer al mismo.

La instrucción denegada no está ante nos y por lo tanto desconocemos su alcance.([5]) Aunque la defensa de coartada no sea motivo para denegar una instrucción sobre una defensa incompatible con aquella si la prueba de cargo justifica tal instrucción, cuestión esta que ahora no tenemos que resolver,([6]) el hecho de que desconozcamos la instrucción denegada, y sobre todo, el hecho de que de la prueba de cargo no surge justificación o excusa para dar muerte al cabo Miranda, son motivos suficientes para desestimar este error. A mayor abundamiento, el propio apelante admite en su alegato, apoyándose en una cita de *Corpus Juris Secundum,* que una persona arrestada ilegalmente no puede disparar contra el oficial o usar un arma mortífera para resistir el arresto, a menos que tenga motivos fundados para creer que está en peligro de perder su vida o de sufrir grave daño corporal, y actúa de buena fe bajo esta aprehensión. El apelante no se encontraba en esa situación, ni hay indicios razonables de

---

([5]) No consta del récord ante nos la instrucción denegada. Lo único que revela el récord son los fundamentos de la negativa del juez a trasmitir dicha instrucción, quien hizo constar: "En cuanto a la segunda instrucción solicitada por la defensa relativa al arresto ilegal, y la oposición que se puede ofrecer al arresto ilegal, la Corte la deniega por ser la misma improcedente en este caso, toda vez que la teoría del acusado es coartada."

([6]) Véase *Pueblo* v. *Torres,* 81 D.P.R. 678; 22 C.J.S. § 54, pág. 118; *Henderson* v. *United States,* 237 F.2d 169, *People* v. *West,* 293 P.2d 166; *People* v. *Keel,* 267 Pac. 161; *People* v. *Reese,* 150 P.2d 571; *State* v. *Lora,* 305 S.W.2d 452. Véase, sin embargo, *Pueblo* v. *Estrella,* 45 D.P.R. 462.

que actuó de buena fe bajo la aprehensión de que su vida estaba en peligro o de que corría el riesgo de sufrir grave daño corporal.

■ El quinto y último error tampoco fue cometido y convenimos en que es frívolo aceptando el siguiente razonamiento del Procurador General: "Al pasar juicio sobre la voluntariedad de una confesión admitida en un proceso criminal, la misión de este Tribunal es la de determinar si la confesión se obtuvo mediante coacción física o sicológica 'a la luz de los hechos admitidos o incontrovertidos'. *Pueblo* v. *Meléndez*, 80 D.P.R. 787, 795; *Pueblo* v. *Fournier*, 80 D.P.R. 390. En este caso surge incontrovertidamente de la prueba que al momento de prestar la declaración inculpatoria ante el Fiscal el apelante no fue coaccionado. Sí hay un conflicto en la prueba sobre si antes la policía lo atropelló. Por lo tanto, es frívola la petición de que se revoque la convicción del acusado porque en cuanto a la voluntariedad de la confesión 'el testimonio fue altamente contradictorio'. Por el contrario, actuó correctamente el Juez al admitir la confesión y dejar que el jurado resolviera ese conflicto. *Pueblo* v. *Fournier*, 77 D.P.R. 222, 284.

"Tampoco fue error del Tribunal el negarse a podar la confesión presentada en evidencia. (T.E. 58–59.) Lejos de tener materia extraña e inmaterial, la misma da fuerza y vigor a la teoría de El Pueblo y explica el origen y el móvil del asesinato cometido." (Alegato del Procurador General, págs. 11–12.)

*Por los motivos expuestos se confirmará la sentencia apelada.*