105 Cal.Rptr.2d 242 (2001)
87 Cal.App.4th 1018
The PEOPLE, Plaintiff and Respondent,
v.
Joseph Andrew BENITEZ, Defendant and Appellant.
No. C031974.
Court of Appeal, Third District.
March 6, 2001.
As Modified March 26, 2001.
Review Granted June 20, 2001.
*244 Linda Buchser, San Francisco, for Defendant and Appellant.
Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Senior Assistant Attorney General, Carlos A. Martinez and Alison Elle Aleman, Deputy Attorneys General, for Plaintiff and Respondent.
*243 HULL, J.
A jury found defendant Joseph Andrew Benitez guilty of attempted terrorist threats against Steven Thompson. (Pen. Code, §§ 422, 664.)[1] After denying defendant's motion to treat the offense as a misdemeanor (§ 17, subd. (b)), and finding that defendant had five prior felony convictions for purposes of the three strikes law (§§ 667, subd. (b)-(i), 1170.12), the trial court sentenced defendant to a term of 25years-to-life.
We reject defendant's contention that an attempt to make a terrorist threat cannot be made criminal because an attempted terrorist threat necessarily punishes speech that is protected by the First Amendment of the United States Constitution. We conclude that, in certain factual circumstances, attempted terrorist threat is a crime. But defendant's conviction must be reversed nonetheless because the trial court's instructions to the jury were not sufficiently specific to preclude the possibility that he was convicted of constitutionally protected speech.
In the unpublished part of our opinion, we conclude that the trial court committed prejudicial error by refusing to give instructions on self-defense.[2]

FACTS AND PROCEDURAL HISTORY
The charges against the defendant arose from a verbal melee among neighbors and acquaintances some of whom who had been socializing and, according to defendant, drinking together earlier in the day. The incident began when defendant, while riding his bicycle near where he lived, encountered neighborhood children, two of whom were sisters, ages five and 10. The five year old began slapping defendant and he yelled at her telling her, profanely, not to slap at him again. According to one of the children, defendant said to both sisters that he was going to get a knife and, perhaps, a gun and "slice [their] throats." The children ran to their home, where defendant had been socializing earlier, and defendant followed in order to explain to their mother what had occurred.
At the house, defendant spoke to Treva Norton, the childrens' mother and asked her "to talk to her kids about hitting on [him] or anyone." She said she would.
Defendant had consumed more than six but less than 12 beers by the time of the confrontation with the children.
After speaking with their mother, defendant rode his bike to a friend's home; his friend was not there. Defendant then rode his bike toward his own home which took him past the Norton house. Defendant's sister, Theresa, lives almost directly across the street from the Norton home.
As he neared Theresa's house, he saw Theresa standing at her house, and Mike French and Steve Thompson were standing at or near the front of the Norton house yelling back and forth at each other. Defendant stopped at his sister's house to find out what was going on. Theresa said the people across the street were "talking crap" about him and they wanted to "beat [his] ass, beat [him] up."
The incident escalated when defendant and French challenged one another on or near the street. French testified that, when he confronted defendant, defendant *245 was in a rage. At some point as they talked, defendant pulled a knife from a place near the water bottle on his bike and told French if he came any closer (than the 10 feet that separated them) defendant would "stick" French. He put the knife in his pocket after French walked away.
French said he then returned to the Norton house, told Treva Norton to call 911, and stood on the porch to watch defendant. According to French, defendant went back to Theresa's house and French heard defendant tell his sister to get his gun because he was going to shoot somebody "over there."
French recalled defendant getting what appeared to be an axe handle from Theresa and walking toward the Norton house stopping in his sister's yard about 30 feet away. He was threatening to beat up Thompson and to kill him. French heard defendant tell Thompson that Thompson "better watch [his] back."
Thompson testified that, during the confrontation with French, defendant displayed a kitchen knife he took from the bottle rack on his bike and threatened French with it. Defendant thereafter went to Theresa's house, got what appeared to Thompson to be a length of a wooden clothes closet bar, and started yelling at French and Thompson threatening to "kick [their] asses" and calling Thompson a "punk." Defendant also said that "as soon as he [got] his guns back that he was going to shoot [them]."
Defendant testified somewhat differently. After initially speaking with his sister, he and French confronted one another and French had an "attitude." They were yelling and cussing at each other and talked of fighting. At some point, a third man, "Dale," joined French and Dale began "talking his crap...." Thompson also was in front of the Norton house yelling at defendant to "`[g]et the hell out of here' or something." At some point both French and Thompson came halfway across the street toward defendant.
Defendant was intoxicated at the time of the 10 minute confrontation. He denied having an axe, a club, a bat, or a knife.
Defendant believed French wanted to do him harm when French wanted to fight him. He felt threatened and, although he did not see any weapons, he knew French carried a pocket knife and he believed that the three confronting him could beat him up. While no one hit defendant he believed they wanted to. He noted that first French and then Thompson came all the way across the street toward him and thought that if one jumped him, both would. Moreover, defendant knew French was jealous of him because defendant knew French's girlfriend.
When defendant was arrested later that evening, he told either Deputy Criswell or Deputy Hess that he wanted to press charges against the three men for assaulting and threatening him.
At trial, defendant requested that the jury be instructed on the defense of self-defense as to count I, and asked the court to read to the jury CALJIC Nos. 5.30 and 5.51.[3] Defense counsel argued that defendant's *246 perception of a threat of injury from French justified defendant's threats to all three men, including Thompson (the alleged victim in count I).
Defense counsel asserted the jury should be allowed to decide whether defendant's threats, if any, were committed by him for the purpose of defending against the threats of physical harm to him, i.e., "as a means to insure his protection against the other parties hurting him by using physical force against his person."
Defense counsel also pointed out that defendant testified he believed he was threatened and that "they were going to kick his ass...." Defense counsel argued that, although defendant did not explicitly state he yelled at the men to protect himself, "that's an inference that can be drawn from the testimony."
The prosecutor objected to the instructions because, in his view of the evidence, "at some point they're both going out into the middle of the street.... It seems like they're mutual aggressors at that point. Even if we believe Mr. Benitez's testimony, again, he's not entitled to claim self-defense." The trial court refused to give instructions on self-defense, observing that defendant denied having any weapon and did not specifically recall making any threats.
The jury found defendant not guilty of making terrorist threats to Steven Thompson, but guilty of the attempt (count I). The jury found the defendant not guilty of count II, making or attempting to make terrorist threats to the child, Angela G, and not guilty of count IV, possessing a dangerous weapon, specifically a billy club. The court earlier had dismissed count III that alleged defendant had made a terrorist threat to the child, Lisa B., and count V that alleged defendant had unlawfully concealed on his person a dirk or dagger.

DISCUSSION

I

The Crime of Attempted Terrorist Threat
Consistent with CALJIC No. 9.94 (6th ed.1996), the trial court instructed the jury that, in order to prove the crime of terrorist threat in violation of section 422, the prosecution was required to prove:
1. Defendant willfully threatened to commit a crime which if committed would result in death or great bodily injury to another person;
2. Defendant made the threat with the specific intent that the statement be taken as a threat;
3. The threatening statement on its face, and under the circumstances in which it was made, was so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat; and
4. The threatening statement caused the other person reasonably to be in sustained fear for his or her own safety or his or her immediate family's safety.[4]
The court also instructed the jury that the crime of attempted terrorist threat was lesser to the crime of terrorist threat and instructed the jury on the general law of attempts in accordance with CALJIC No. 6.00. Specifically, the court instructed the jury that an attempt required two elements, the specific intent to commit the underlying crime and a direct but ineffectual act done toward its commission. Specifically, the court also instructed that an act of a person who intends to commit a crime is an attempt where the act clearly indicates a certain unambiguous intent to commit the crime and the act is an immediate step in the present execution of the criminal design, the progress of which would have been completed unless interrupted *247 by a circumstance not intended in the original design.
The jury found defendant not guilty of terrorist threats but guilty of attempted terrorist threats. In asserting that his conviction must be reversed, defendant argues "there can be no crime of attempted terrorist threat," otherwise a person may be punished for speech that is protected by the First Amendment of the United States Constitution. Completely ignoring the constitutional argument squarely presented in defendant's briefing, the People merely urge the simplistic and superficial view that the elements of the general intent statute, section 664, were satisfied in this case. We conclude that there is a crime of attempted terrorist threat, but that defendant's conviction must be reversed because the jury instructions allowed room for the jurors to convict him based solely on the exercise of his First Amendment right to free speech.
Because the right to free speech circumscribes the law relating to threats, the latter has earned substantial attention by the courts and, as this case demonstrates, has not yet been fully settled. A brief history of the law is in order.
In 1987 the Legislature repealed section 422 of the Penal Code, which statute had been found unconstitutionally vague in People v. Mirmirani (1981) 30 Cal.3d 375, 178 Cal.Rptr. 792, 636 P.2d 1130.
In 1988 the Legislature enacted a new section 422. The new statute required the threatening language be "on its face, and under the circumstances in which it was made, ... so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution" of the threat. (Pen.Code, § 422, 1st ¶ see CALJIC No. 9.94, element 3.)
The quoted language was imported, virtually verbatim, from the decision of the United States Court of Appeals for the Second Circuit in United States v. Kelner (2d Cir.1976) 534 F.2d 1020, at page 1027 (hereafter Kelner), the seminal case on First Amendment issues surrounding the criminal punishment of pure speech.
Kelner affirmed a conviction for causing to be transmitted in interstate commerce a communication threatening to injure the person of another (18 U.S.C. § 875(c)). Kelner considered those circumstances under which an unequivocal threat that has not ripened into an overt act in the nature of an attempt (i.e., an attempt to carry out the threatened action, not the threat itself) is punishable under the First Amendment even though it may also involve elements of expression. (Kelner, supra, 534 F.2d at p. 1026.) Kelner found guidance in Watts v. United States (1969) 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (hereafter Watts ).
In Watts, the defendant, while participating in a political rally, said he would ignore a draft notice and that, if the government made him carry a rifle, the first person he wanted to get in his sights was President Lyndon Baines Johnson. (Watts, supra, 394 U.S. at p. 706, 89 S.Ct. at 1401, 22 L.Ed.2d at p. 666.) The United States Supreme Court held that the statute punishing threats to the President constitutional on its face, but reversed the conviction because, under the facts, the statement was not a "true `threat'" but mere political hyperbole. (Watts, supra, 394 U.S. at p. 708, 89 S.Ct. at p. 1401, 22 L.Ed.2d at p. 667.)
Kelner found that, as in Watts, there was a strong "governmental interest of reducing the climate of violence, to which true threats of injury to others necessarily contribute." (Kelner, supra, 534 F.2d at p. 1026.) The Kelner court explained that Watts found only true threats punishable, and excluded threats which, in context, were conditional and made in jest. (Kelner, supra, 534 F.2d at p. 1026.)
Kelner decided that punishable threats were "only those which according to their language and context conveyed a gravity of purpose and likelihood of execution so *248 as to constitute speech beyond the pale of protected `vehement, caustic ... unpleasantly sharp attacks on government and public officials.'" (Kelner, supra, 534 F.2d at p. 1026, quoting New York Times v. Sullivan (1964) 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686, 701; see Watts, supra, 394 U.S. at p. 708, 89 S.Ct. at 1401, 22 L.Ed.2d at p. 667.)
Kelner continued: "The purpose and effect of the Watts constitutionally[ ]limited definition of the term `threat' is to insure that only unequivocal, unconditional and specific expressions of intention immediately to inflict injury may be punished," in short, those of the same nature as threats properly punished under statutes prohibiting extortion, blackmail and assault notwithstanding the First Amendment. (Kelner, supra, 534 F.2d at p. 1027.)
The California Supreme Court interpreted Kelner in People v. Bolin (1998) 18 Cal.4th 297, 75 Cal.Rptr.2d 412, 956 P.2d 374, and in In re M.S. (1995) 10 Cal.4th 698, 42 Cal.Rptr.2d 355, 896 P.2d 1365. Both cases suggest that, as a constitutional matter, a fact determination based on Reiner's precise wording is not a necessary prerequisite to finding a true threat, if other elements of the statute in question provide assurance that a defendant's statement was in fact a true threat.
In Bolin, defendant wrote a letter stating he would kill the addressee if the addressee did not do certain things and stop doing other things. (Bolin, supra, 18 Cal.4th at p. 336, fn. 11, 75 Cal.Rptr.2d 412, 956 P.2d 374 .) The defendant claimed that, because the letter did not contain an unconditional threat, it did not violate section 422 as a matter of law. (Id. at p. 337.) Bolin interpreted Kelner and Watts, to hold that section 422 does not require an unconditional threat. (Id. at p. 338, 89 S.Ct. 1399.)
Bolin explained that the Legislature incorporated the Kelner language when it revised section 422 in 1988. (Bolin, supra, 18 Cal.4th at p. 338, 75 Cal.Rptr.2d 412, 956 P.2d 374.) That language was incorporated into element 4 of CALJIC No. 9.94. After discussing Watts, Bolin said: "As the Kelner court understood this analysis, the [United States] Supreme Court was not adopting a bright line test based on the use of conditional language but simply illustrating the general principle that punishable true threats must express an intention of being carried out." (Bolin, supra, 18 Cal.4th at p. 339, 75 Cal. Rptr.2d 412, 956 P.2d 374, italics added.)
"Given the rationale of Kelner and Watts, it becomes clear the reference to an `unconditional' threat in section 422 is not absolute.... `It is clear, then, that the Kelner court's use of the word "unconditional" was not meant to prohibit prosecution of all threats involving an "if clause, but only to prohibit prosecution based on threats whose conditions precluded them from conveying a gravity of purpose and imminent prospect of execution.'" (Bolin, supra, 18 Cal.4th at p. 339, 75 Cal.Rptr.2d 412, 956 P.2d 374, italics added.)
In re M.S., supra, 10 Cal.4th 698, 42 Cal.Rptr.2d 355, 896 P.2d 1365, interpreted Kelner and Watts in examining the constitutionality of section 422.6, a hate crime statute used there to prosecute minors who had threatened gay men because of their sexual orientation. Among other things, section 422.6 makes it a crime to, by force or threat of force, willfully threaten any other person in the free exercise of his rights because of the person's sexual orientation or other characteristics, such as race or religion. (§ 422.6, subd. (a).)
However, subdivision (c) of section 422.6 also provides that no violation of subdivision (a) can occur by speech alone, unless the speech threatened violence against a specific person and the defendant had the "apparent ability to carry out the threat." (In re M.S., 10 Cal.4th at pp. 706-707, fn. 1, 42 Cal.Rptr.2d 355, 896 P.2d 1365 [citing identical provisions of former section 422.6].)
The minors in In re M.S. asserted that section 422.6 improperly criminalized *249 speech outside the limited category of true threats that are punishable consistently with the First Amendment. (In re M.S., supra, 10 Cal.4th at pp. 709-710, 42 Cal. Rptr.2d 355, 896 P.2d 1365.) In their view, "the First Amendment always requires the threatened harm to be imminent for the threat to be constitutionally punishable," and the statute's "`apparent ability'" element was not enough. (10 Cal.4th at p. 711, 42 Cal.Rptr.2d 355, 896 P.2d 1365.)
The California Supreme Court held the First Amendment does not require the threatened harm be imminent to punish the threat. (In re M.S., supra, 10 Cal.4th at p. 711, 42 Cal.Rptr.2d 355, 896 P.2d 1365.) It found the minors' reading of Kelner "overly expansive." (10 Cal.4th at p. 711, 42 Cal.Rptr.2d 355, 896 P.2d 1365.) Our high court observed that Kelner concluded the federal Constitution did not require a specific intent to carry out the threat, "so long as circumstances demonstrate the threats `are so unambiguous and have such immediacy that they convincingly express an intention of being carried out. (534 F.2d at p. 1027, italics in original.)' " (In re M.S., supra, 10 Cal.4th at p. 712, 42 Cal.Rptr.2d 355, 896 P.2d 1365.)
The court decided in In re M.S. that Kelner did not require every valid statute punishing threats to contain the element of "immediacy or imminence" (In re M.S., supra, 10 Cal.4th at p. 712, 42 Cal.Rptr.2d 355, 896 P.2d 1365) and that, because Kelner involved a statute that did not require the specific intent to carry out the threat, Kelner used the immediacy requirement to restrict the statute's reach to true threats (as required by the federal Constitution and Watts). (10 Cal.4th at p. 712, 42 Cal. Rptr.2d 355, 896 P.2d 1365.)
Further according to the court in In re M.S., Kelner found the requisite immediacy in the fact defendant professed the "present ability" to carry out the threat. (In re M.S., supra, 10 Cal.4th at p. 712, 42 Cal.Rptr.2d 355, 896 P.2d 1365.) Because subdivision (c) of section 422.6 contained an "apparent ability" element, it was consistent with Kelner. (10 Cal.4th at p. 712, 42 Cal.Rptr.2d 355, 896 P.2d 1365.) "Apparent ability" to carry out the threat means the threat "would reasonably tend to induce fear in the victim," even if the victim does not actually experience fear; it is an objective rather than a subjective test. (Id. at p. 715, 42 Cal.Rptr.2d 355, 896 P.2d 1365.)
Finally the court found that, in contrast to the statute in Kelner, section 422.6 expressly requires that a threat be "willful," i.e, proof the defendant had the specific intent by means of the threats to interfere with the victim's legally protected rights, thus protecting against its misapplication to protected speech. (In re M.S., supra, 10 Cal.4th at pp. 712-713, 42 Cal.Rptr.2d 355, 896 P.2d 1365.) Hence, the concerns that led Kelner to impose the immediacy requirement were met. (10 Cal.4th at pp. 713-714, 42 Cal.Rptr.2d 355, 896 P.2d 1365.)
In sum, the First Amendment allows punishment of that which has come to be referred to as a "true threat," as defined by the cases we have surveyed, and section 422 properly incorporates the elements of a true threat into its definition of terrorist threat.
The question before us is whether the general superimposition of the law of attempts upon the elements of the crime of terrorist threat leaves open the possibility that defendant was found not guilty of making a "true threat" but convicted instead of attempting, but not conveying, a true threat. We find that it does. His conviction cannot stand if he did not make a true threat since, absent a true threat, his words were mere speech protected by the First Amendment. So protected, they cannot be made criminal by indirection by the law of attempts. Constitutionally speaking, conveying anything less than a true threat cannot constitute a crime.
The crime of terrorist threat is committed when a person: (1) willfully threatens *250 to commit a crime that would result in another's death or great bodily injury (2) with the specific intent that it be taken as a threat (3) which threat is, on its face, and under the circumstances in which it was made was so unequivocal, unconditional, immediate and specific as to convey to the person threatened a gravity of purpose and an immediate prospect of execution of the threat which (4) causes another to be put in sustained fear of his or his immediate family's safety (5) and which fear is reasonable. (§ 422.)
Resolution of this appeal does not require us to discuss or decide the permissible interplay of the law of attempts and each of the elements of the offense. If the evidence presented at trial and the instructions presented to the jury leave open the possibility that defendant was convicted of only attempting but not conveying a true threat, his conviction cannot stand.
Depending on whom the jury believed, the jury reasonably could have concluded the confrontation was a mere "neighborhood dispute," as defendant would characterize it. The evidence was in conflict, but some of it indicated that Thompson and the two men with him were yelling at defendant and his sister and that Thompson and the other two men were "talking crap." Thus the jury may have decided that, under all the circumstances, defendant's words and actions were insufficient to convey a gravity of purpose and an immediate prospect of execution of his threat to "stick" one of the men, to get his gun and shoot one of them or to beat one of them with an axe handle. But the jury may also have found that defendant intended to convey a threat in order to keep the others at bay.
It was up to the jury to sort out the facts. Plainly, the jury could have concluded that, under the circumstances and regardless of his intent, defendant's statement conveyed nothing more than mere defensive puffing and posturing in response to similar conduct by his opponents. In other words, the jury may have found the evidence insufficient to prove that defendant made a "true threat" and, as we have said earlier, anything less than a true threat is constitutionally protected speech. But once the jury decided the defendant intended a threat, it might then have erroneously concluded that his unsuccessful effort to convey the threat was punishable as an attempt. That is, when the jury applied the language of the general instruction defining an attempt (CALJIC No. 6.00), it may have decided that, since defendant intended to convey a threat and undertook direct but ineffectual acts toward conveying that threat, he was guilty of attempted terrorist threat. If so, the result was a conviction of the crime of attempt in the absence of a "true threat." Had it been properly instructed, the jury would have returned a verdict of not guilty of an attempt if it found there was no "true threat."
The jury did not receive instructions necessary to ensure that it did not convict defendant of protected speech. Because the instructional error implicated the First Amendment of the United States Constitution, Chapman review applies. (Chapman v. California, (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710-711.) We conclude the error was not harmless beyond a reasonable doubt. Hence, we reverse the conviction for attempted terrorist threat (§§ 422, 664).
But this is not to say that one cannot be convicted of attempting a terrorist threat, that is, attempting to violate section 422.
A failure of proof beyond a reasonable doubt as to any one of the first three elements of the offense requires an acquittal. Under certain circumstances, a failure of proof as to the fourth element leaves room for a conviction of attempted terrorist threat.
The fourth element of the offense requires that the threat caused the person to whom it was directed reasonably to be in sustained fear for his safety or the safety of his family. Actually there are two requirements *251 here. The victim must, in fact, have been placed in sustained fear for his or his family's safety and that fear must have been reasonable.
If the victim testifies that he was placed in sustained fear by a defendant's threat, but the jury determines the fear was not reasonable, there is no unlawful threat and there can be no attempt. This is so because the Legislature has said, by writing section 422 as it has, that words that do not give rise to a reasonable fear for one's safety are not criminal. And words that do not amount to a criminal threat cannot be made criminal by the law of attempts.
One other possibility remains. Conceivably one could deliver a true threat under circumstances that satisfy all the elements of section 422 except that the victim was not in fact placed in fear for his safety for any number of reasons. Thus, publishing a true threat that reasonably would induce fear, but one that, for whatever reason, does not induce in the particular victim a sustained fear for his or his family's safety, may be punishable as an attempt.
By way of example, a defendant might commit acts satisfying the other elements of the crime but unknowingly communicate his threat to a person who is hearing impaired or a person who, for whatever reason, did not appreciate the gravity or immediate prospect of execution of the threat and thus was not placed in fear by the defendant's threat. In cases such as those, the fortuitous fact the intended victim did not comprehend or fear the threat should not prevent the defendant from being convicted of attempt when he in fact intended to and did convey a true threat, successful but for a circumstance beyond his control.
Similarly, on this record, there remains the possibility that, given the circumstances of this argument among neighbors and acquaintances, the jury after seeing and hearing the witnesses did not believe the victim of the threat was in fact put in sustained fear for his safety, although he should have been, and, thus, found evidence of that element of the offense insufficient. Under those circumstances, however, and assuming the other elements are met, there is nothing that precludes a finding that defendant made a true threat and attempted to make a terrorist threat unsuccessful only for its unintended failure to place the victim in fear for his safety.
Accordingly, we conclude that, although defendant's conviction must be reversed because the instructions given to the jury were inadequate, he may be retried for the crime of attempted terrorist threat. In the event that the case is tried again to a jury, the trial court shall instruct the jurors in a manner consistent with this opinion.

II

Self-defense
Defendant contends the trial erred in denying his request to instruct the jury on self-defense. We agree. The principles that follow guide our decision.
It is elementary that when requested the court should instruct the jury on every material question upon which there is evidence substantial enough to merit consideration. (People v. Flannel (1979) 25 Cal.3d 668, 684-685, 160 Cal. Rptr. 84, 603 P.2d 1.) The fact that the evidence may not be of a character to inspire belief does not justify refusal of a requested instruction; the question of the believability of the evidence is a question exclusively for the jury. (Id. at p. 684, 160 Cal.Rptr. 84, 603 P.2d 1; People v. Lemus (1988) 203 Cal.App.3d 470, 477-478, 249 Cal.Rptr. 897.)
Evidence is "substantial" in this context if it is evidence from which reasonable jurors could conclude that the particular facts underlying the instruction existed. (People v. Wickersham (1982) 32 Cal.3d 307, 324, 185 Cal.Rptr. 436, 650 P.2d 311.)
Finally, criminal defendants normally are permitted to advance inconsistent defenses *252 and may deny an act but also claim self-defense. (See 1 Witkin & Epstein, Cal. criminal law (3d ed. 2000) Defenses, § 265, pp. 435-36; People v. Keel (1928) 91 Cal.App. 599, 605, 267 P. 161 [defendant's denial that he cut the victim did not warrant refusal of a self-defense instruction].)
Here, defendant testified that French, Thompson and Dale were yelling at defendant's sister, and that she told him the three men wanted to beat him. Defendant believed the men were threatening him and wanted to hit him, and whether or not they were armed, he felt outnumbered. Defendant also testified that French and Thompson approached him and that he thought both were going to "jump" him. Based on their past history, defendant believed French especially was ready to do him bodily harm and testified that all three men came toward him while he was at his sister's house. At the time of his arrest, defendant told one of the deputies he wanted to press charges against the three men for assaulting and threatening him. There was, therefore, substantial evidence to support defendant's request that the court instruct the jury on the law of self-defense. Whether, as the prosecution argued, the defendant was an aggressor was a matter for the jury to decide.
We reject the Attorney General's position that defendant could not "have reasonably believed or feared that bodily injury was about to be inflicted upon him" on the grounds that there was no physical contact between defendant and the three men, and that defendant and the three men were not "in direct proximity with each other so as to permit any assault, battery or other bodily contact or injury." Whether defendant's belief was reasonable was a factual matter for the jury and defendant was entitled to have the jury consider the issue. Lemus, supra, 203 Cal.App.3d at p. 477, 249 Cal.Rptr. 897.) The law does not require a defendant to suffer bodily injury before the right to self-defense arises, but provides instead that a person is privileged to act to prevent such injury. (See CALJIC No. 5.30 (6th ed. 1996) and cases and authorities cited.)
Although the evidence of the distance between defendant and Norton's house and the people situated there varied, Norton testified the distance between her front door and defendant standing in his sister's yard was about 30 feet, and at one point French gave 30 feet as the distance between him and defendant when the latter had the stick. Reasonable jurors could conclude that this was close enough to support a reasonable belief by defendant that he was in imminent danger.
The trial court erred by declining to instruct the jury on self-defense. We consider whether the error was prejudicial.
In 1998 the California Supreme Court disapproved a line of cases that required automatic reversal for improper refusal to instruct a jury on every material issue presented by the evidence, and ruled that "the prejudicial effect of such error is to be determined, for purposes of California law, under the generally applicable prejudicial error test embodied in article VI, section 13 [of the California Constitution]. People v. Watson [1956] 46 Cal.2d 818, 836-837 [299 P.2d 243].)" People v. Flood (1998) 18 Cal.4th 470, 490, 76 Cal.Rptr.2d 180, 957 P.2d 869 original italics.)
Flood explained: "'"Nothing in the language or history of article VI, section 13, suggests that its requirement of actual prejudice, determined by reference to `the entire cause, including the evidence,' applies to some forms of `misdirection,' but not to others. [Citation.]' On its face, therefore, the California Constitution does not support a rule that treats the failure to instruct on an element of a crime (uniquely, among instruction errors) as reversible per se." Flood, supra, 18 Cal.4th at p. 487, 76 Cal.Rptr.2d 180, 957 P.2d 869). It follows that failure to instruct on a defense to a crime is also no longer reversible per se under California law. *253 Flood also addressed federal constitutional error for failure to instruct concerning the elements of a crime, since instructional error "relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense" violates the defendant's due process rights under the federal Constitution. (Flood supra, 18 Cal.4th at pp. 479-480, 491, 76 Cal.Rptr.2d 180, 957 P.2d 869.) Our Supreme Court ruled that "instructional errorswhether misdescriptions, omissions, or presumptionsas a general matter fall within the broad category of trial errors subject to Chapman review on direct appeal." (Flood, supra, 18 Cal.4th at p. 499, 76 Cal.Rptr.2d 180, 957 P.2d 869.)
Although Flood addressed the failure to instruct on an element of a crime, and not a defense, the failure to instruct on self-defensewhich, if successful, would require that defendant be acquitted of the charges brought against himimplicates the same constitutional considerations as failure to instruct on an element of the offense. Conceptually, once the defense is raised, the prosecution must prove all elements of the offense beyond a reasonable doubt and must prove, also beyond a reasonable doubt, defendant did not act in self-defense; that is, must prove that defendant's conduct was unlawful. If there remains a reasonable doubt whether defendant acted unlawfully, he must be acquitted. Defendant "has no burden of proof or persuasion, even as to his defenses." (People v. Gonzalez (1990) 51 Cal.3d 1179, 1214-1215, 275 Cal.Rptr. 729, 800 P.2d 1159, original italics.) As Flood held, relieving the state of its burden to prove its case beyond a reasonable doubt violates defendant's right to due process of law unless the error is itself harmless beyond a reasonable doubt. (See Sullivan v. Louisiana (1993) 508 U.S. 275, 280, 113 S.Ct. 2078, 2082, 124 L.Ed.2d 182, 190.)
Employing the Chapman standard, we cannot conclude that the failure to give the self-defense instructions was harmless. As recited above, there was substantial evidence whichif believed could have raised a reasonable doubt in the jury's mind whether defendant's conduct was unlawful in that defendant engaged in the conduct of which he was convicted because he reasonably believed injury was about to be inflicted upon him by Thompson or one or more members of Thompson's group (CALJIC No. 5.30 (6th ed. 1996)), or that such danger was at least apparent (CALJIC No. 5.51 (6th ed. 1996)). Because the jury acquitted defendant of several charges, it may have found at least part of his testimony credible.
Further, victim Thompson's testimony that he said nothing to defendant except to deny he was a punk, and that French did not yell at defendant or his sister, was contradicted by Treva Norton, who heard all three men yelling at defendant and his sister. Norton's testimony also arguably conflicted with French's claim that he did not say anything to anger defendant, and did not threaten him. Lela Brinkley testified that all three men were yelling at defendant.
Thompson's testimony that he and French merely sat or stood listening to defendant conflicted with defendant's view that both men approached him. French admitted he was angry at defendant with respect to French's girlfriend. In addition, the distance between defendant and the other men may have been 30 feet or less.
Finally, we cannot ignore the fact that the prosecutor began his closing argument by asserting that defendant could not be acquitted on a self-defense theory. The trial court did not provide the jury with guidance in determining whether or how to apply the defense of self-defense to the facts in this case.
As there was sufficient evidence which, if believed, may have caused the jury to conclude that the prosecution had not proven beyond a reasonable doubt that defendant's conduct was unlawful, we cannot *254 say the failure to instruct was harmless under the Chapman standard.

DISPOSITION
The judgment is reversed.
SCOTLAND, P.J., and MORRISON, J., concur.
NOTES
[1] All undesignated statutory references are to the Penal Code.
[2] Because we reverse on this ground, we do not reach the claims that defendant's sentence constitutes cruel or unusual punishment and that the court erred by imposing a $200 penalty assessment.
[3] CALJIC No. 5.30 (6th ed. 1996) states: "It is lawful for a person who is being assaulted to defend [himself] [herself] from attack if, as a reasonable person, [he][she] has grounds for believing and does believe that bodily injury is about to be inflicted upon [him][her]. In doing so that person may use all force and means which [he][she] believes to be reasonably necessary and which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent."

CALJIC No. 5.51 (6th ed.1996) provides: "Actual danger is not necessary to justify self-defense. If one is confronted by the appearance of danger which arouses in [his][her] mind, as a reasonable person, an actual belief and fear that [he] [her] is about to suffer bodily injury, and if a reasonable person in a like situation, seeing and knowing the same facts, would be justified in believing [himself] [herself] in like danger, and if that individual so confronted acts in self-defense upon these appearances and from that fear and actual beliefs, the person's right of self-defense is the same whether the danger is real or merely apparent."
[4] CALJIC No. 9.94 was revised in 1999 to reflect legislative changes to the statute and judicial opinions construing it. The changes do not bear on our analysis of the issue before us.