Filed 12/16/13  P. v. Gutierrez CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DAVID GUTIERREZ,<br><br>        Defendant and Appellant. | B238953<br><br>(Los Angeles County<br>Super. Ct. No. SA077958)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on November 18, 2013, be modified as follows:

On page 2, delete the third paragraph.

"Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following."

There is no change in the judgment.

Appellant's petition for rehearing is denied.

Filed 11/18/13  P. v. Gutierrez CA2/3 (unmodified version)
### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DAVID GUTIERREZ,<br><br>    Defendant and Appellant. | B238953<br><br>(Los Angeles County<br>Super. Ct. No. SA077958) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James R. Dabney, Judge.  Affirmed as modified.

Helen S. Irza, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, David Gutierrez, appeals his conviction for assault by means of force likely to produce great bodily injury, with a prior serious felony conviction finding (Pen. Code, §§ 245, 667, subds. (b)-(i)).[1] He was sentenced to state prison for a term of eight years.

The judgment is affirmed as modified.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

On June 19, 2011, sometime around 2:30 a.m., Rosa Lopez was awakened when defendant Gutierrez began pounding with his fists on the door and window of her Culver City apartment. Gutierrez demanded that she let him in, yelling, "Open up for me, lady. Let me come in and sleep. I am sleepy." Lopez did not know Gutierrez, although she had seen him hanging around the laundry room in her apartment complex the previous morning. Lopez told Gutierrez to leave, but he refused and kept demanding to be let into her apartment. He stayed for a long time, pounding and yelling. Lopez testified she did not call the police because she only spoke Spanish.

Gutierrez eventually left, but then returned about 4:00 a.m. Lopez testified Gutierrez was now furiously banging on her window and kicking her door. He also swore, calling her "bitch," "fucker" and "motherfucker." He opened a box of personal items she had sitting outside her door and proceeded to break some of them. Lopez called her daughter, Maria Roman, and said she was really scared. Roman lived with her boyfriend,[2] Umberto Juarez, one floor down in the same apartment complex. Roman and Juarez had already been woken up by the loud banging and yelling.

---

[1]     All further references are to the Penal Code unless otherwise specified.

[2]     Although Juarez described himself as Roman's boyfriend, Roman referred to him sometimes as her boyfriend and sometimes as her husband.

Roman called the police, but no one came. Juarez and Roman went back to sleep, but they were awakened again around 6:30 a.m. by the sound of Gutierrez swearing and demanding to be let into Lopez's apartment. Juarez, who was unarmed and wearing pajamas, stepped outside his apartment and told Gutierrez they had called the police and he should leave. Gutierrez started walking down the stairs. Juarez testified he was "pretty upset" and he told Gutierrez to "get the fuck out of here." When Gutierrez made a motion as if to grab the broom that was leaning against a wall, Juarez stepped back inside his apartment. But Gutierrez did not actually grab the broom; he just walked out the apartment complex entrance and onto the street.

Juarez left his apartment again and walked over to close the apartment complex door, but Gutierrez was still standing there. Gutierrez stared at Juarez, "mad-dogging" him, and asked Juarez what his problem was. Gutierrez was yelling. Roman had followed Juarez out of their apartment and Juarez's brother Mario, who lived in another apartment in the same complex, also came out. None of them was armed or had anything in his hands. Lopez came downstairs. Juarez was standing about five feet from Gutierrez, but Lopez got in between them and yelled at Gutierrez for keeping her up all night. She told him the police had been called and he better leave. Meanwhile, Roman was yelling at Juarez and the others to go back inside their apartments. Everyone was shouting, including Gutierrez, who suddenly pulled a sock out of his pocket and swung it in Lopez's direction. The sock had a grapefruit-sized rock inside of it and the rock hit Lopez in the head.

The three testifying eyewitnesses each gave a version of what they saw at this moment. Juarez testified Lopez "was talking to [Gutierrez], and all of a sudden, he pulled something out of his pocket and he swang it at her. It was like a bam sort of thing." Lopez testified: "Since he was so close, I said, 'Golly.' I said, 'All night long you did not let me sleep.' And apart from that, I told him, 'Everything that you broke.'. . . And then . . . he pulled out this. And then he was like swinging it around, and he hit me." Roman testified: "[W]e were all looking towards my mom and him. And out of one blink, he grabbed something or reaching into his pocket and hit her."

3

Lopez also testified that, immediately before Gutierrez hit her, he had been "shouting terribly" and calling her "bitch" and "whore." Lopez denied Juarez had ever threatened to hurt Gutierrez.

Gutierrez's throwing motion caused the rock to escape from the end of the sock. The rock flew out and shattered when it hit the ground. Gutierrez started running away, but then he turned around, pretended his hand was a gun and mimicked shooting the others while he laughed. Juarez, Roman, Mario and Lopez then chased Gutierrez for several blocks until he jumped a fence and ran into someone's yard. People from that house and their neighbors joined in the chase, carrying sticks and bats.

When the police finally arrived they found Gutierrez sitting in a nearby garage, drinking a bottle of water and watching television. They arrested him.

The defense did not present any evidence.

## CONTENTIONS

1. The trial court erred by refusing to instruct the jury on self-defense.
2. There was prosecutorial misconduct during closing argument.
3. There was cumulative error.
4. The trial court erred by using a juvenile court disposition as a strike.
5. The trial court erred when calculating Gutierrez's presentence custody credits.

## DISCUSSION

1. *Trial court properly refused to instruct on self-defense.*

Gutierrez contends the trial court erred by denying his request for the jury to be instructed on self-defense. This claim is meritless.

a. *Background.*

At the close of evidence, defense counsel asked for a self-defense instruction:

"[Defense counsel]: I was going to request self-defense, Your Honor.

"The Court: Based on what?

"[Defense counsel]: Based on . . . the 911 tapes, basically. That Mr. Umberto Juarez was outside. He was yelling at Mr. Gutierrez. That we can hear that. That we can hear the wife [i.e., Roman] yelling at him to stop. She basically said to stop, let him

4

leave.  She testified to that.  [¶]  So . . . there is a fair assumption that there may have been something going on.  Whether [Juarez has] testified to the fact that he didn't touch him . . . he was being aggressive at least verbally.

"The Court:  Okay.

"[Defense counsel]:  And that [Juarez] was present.  He was present there when [Lopez] came down the steps.  So that's what I'm asking for.  I mean, I think that it's not a stretch to say that Mr. Gutierrez may have felt threatened.

"The Court:  All right.  First of all, I think it's kind of difficult to get that instruction without the defendant testifying, unless there's some circumstances [from] which I can infer he had the subjective intent, and that's in fact why he acted in the manner that he did.  I have no such evidence.  [¶]  And moreover . . . there are two tapes of the 911 call, the one involving the incident in front of the apartment building, where we hear Mr. Juarez saying . . . get the 'F' out of here, and things of that nature, which is consistent with what he testified here.  And I don't think that warrants giving the self-defense instruction."

        b.  *Legal principles.*

"[W]e . . . [have] explained that a trial court must give a requested instruction only when the defense is supported by 'substantial evidence,' that is, evidence sufficient to 'deserve consideration by the jury,' not 'whenever *any* evidence is presented, no matter how weak.' " (*People v. Williams* (1992) 4 Cal.4th 354, 361.)  Substantial evidence is "evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist." (*People v. Blair* (2005) 36 Cal.4th 686, 745.)

To justify an instruction on self-defense "the defendant must actually and reasonably believe in the need to defend.  [Citation.] . . .  To constitute 'perfect self-defense,' i.e., to exonerate the person completely, the belief must also be objectively

reasonable.[3] [Citations.]  As the Legislature has stated, '[T]he circumstances must be sufficient to excite the fears of a reasonable person . . . .'  [Citations.] . . . [¶]  Although the belief in the need to defend must be objectively reasonable, a jury must consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge . . . .'  [Citation.]  It judges reasonableness 'from the point of view of a reasonable person in the position of defendant . . . .'  [Citation.]  . . . As we stated long ago, ' . . . a defendant is entitled to have a jury take into consideration all the elements in the case which might be expected to operate on his mind . . . .'  [Citation.]"  (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082-1083.)

" ' "It has long been established, both in tort and criminal law, that 'the least touching' may constitute battery.  In other words, *force* against the person is enough, it need not be violent or severe, it need not cause bodily harm or even pain, and it need not leave any mark." [Citation.]' " (*People v. Myers* (1998) 61 Cal.App.4th 328, 335.) "It follows that an offensive touching, although it inflicts no bodily harm, may nonetheless constitute a battery, which the victim is privileged to resist with such force as is reasonable under the circumstances." (*Ibid*.)  Based on these principles, *Myers* held the trial court erred by refusing to instruct the jury on the defendant's right to defend himself against a battery.  (*Id*. at pp. 335-336.)

        c.  *Discussion*.

Gutierrez contends his jury should have been instructed he had the right to use reasonable force to defend himself from the "imminent danger of being subjected to an assault or battery by [Juarez] . . . ."  He argues Juarez "took several threatening steps toward appellant as appellant was coming down the stairs.  He only stepped back inside the apartment when appellant pretended to grab a broom.  Then, when appellant did not actually grab the broom, [Juarez] stepped back outside of the apartment and began to

---

3    Imperfect self-defense is not a defense to a general intent crime like assault. (See *People v. Minifie* (1996) 13 Cal.4th 1055, 1069 ["this case involves an assault, not a homicide, and thus no question of *imperfect* self-defense is presented"].)

follow him as Roman yelled, 'Stop!' 'Enough!' and 'Let him leave!' [and] while Lopez yelled, 'No! Berto, no!' Although appellant, as a trespasser, was originally in the wrong, he retreated and was no longer trespassing once out on the sidewalk. The four residents nevertheless followed him and all arrived within seconds to where he was standing outside the apartment complex where they stood very close to him and angrily shouted at him about the disturbance he had caused. Significantly, while the residents were approaching appellant outside on the street, Roman continued to yell at [Juarez] to leave appellant alone." "Based on this evidence, reasonable jurors, had they been properly instructed, could have concluded that the use of force at least sufficient to create a distraction could be found to be warranted by the apparent impending assault" by Juarez. We are not persuaded.

Gutierrez correctly points out there can be substantial evidence of a defendant's state of mind even if the defendant does not testify. However, Gutierrez incorrectly asserts the trial court judge in this case "was mistaken in his belief that appellant was *required* to testify in order to receive the instruction . . . ." (Italics added.) It is clear from the reporter's transcript that the trial court believed no such thing. The court merely said it was "difficult" to get a self-defense instruction when the defendant does not testify, "unless there's some circumstances [from] which I can infer he had the subjective intent . . . ."

As Gutierrez acknowledges, there was no direct evidence he actually believed he had to defend himself. Furthermore, what Gutierrez calls circumstantial evidence of his actual belief, we understand as mere speculation. A good example of this problem is the claim that Juarez took two "threatening" steps out of his apartment to confront Gutierrez. Actually, nothing in the trial testimony shows there was anything threatening about Juarez's conduct at this point. Without any testimony from Gutierrez, we are left to merely speculate that he might have made a feint at grabbing the broom because he felt threatened by Juarez.

7

As the Attorney General points out, defense counsel, while arguing for a self-defense instruction, offered the trial court "nothing more than vague speculation that – because people were heard yelling on the 911 call – 'there may have been something going on.' Counsel never specified what that 'something' might have been. Counsel did argue . . . that Juarez had been 'verbally aggressive.'. . . [But] even if Juarez was verbally aggressive . . . there was no evidence that appellant ever felt threatened by Juarez or anyone else, and certainly no evidence that appellant's state of mind caused him to strike Lopez in an effort to defend himself." "[S]peculation is not evidence, less still substantial evidence." (*People v. Berryman* (1993) 6 Cal.4th 1048, 1081, disapproved on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) We agree with the Attorney General that "the unrebutted prosecution evidence . . . presented only one version of events," a version which did not support an inference Gutierrez hit Lopez with the rock because he felt the need to defend himself.

Moreover, Gutierrez's contention is predicated on a misinterpretation of the reasonable person standard. The "jury must consider what 'would appear to be necessary to a reasonable person *in a similar situation and with similar knowledge . . . .*' " (*People v. Humphrey*, *supra*, 13 Cal.4th at pp. 1082-1083, italics added.) Or, in the words of the standard self-defense instruction: "When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed." (CALCRIM No. 3470.)

That means a reasonable person *in Gutierrez's position* is not an innocent bystander magically dropped into the midst of these events, and suddenly confronted by an irate Juarez, without any knowledge of what went before. Rather, the reasonable person knows Gutierrez has just spent the entire night terrorizing one of the residents of this apartment complex, banging on her door and window, breaking her possessions, yelling and swearing at her; and, upon being informed by Juarez that the police have been called, reacting aggressively by mad-dogging him. In this situation, reasonable people

8

would not have lingered in the street and continued the shouting match; reasonable people would not have lashed out with the rock believing they were in imminent danger of being assaulted. Reasonable people would have apologized profusely for their misbehavior and tried to leave before the police arrived.

Gutierrez's assertion he was entitled to use force in these circumstances is unsupported by any pertinent authority he cites. Gutierrez relies most heavily on *People v. Benitez* (2001) 87 Cal.App.4th 1018, review granted June 20, 2001, S096868, review dismissed April 17, 2002, which he cites six times in his briefing. But *Benitez* is not a citable case. (See Cal. Rules of Court, rule 8.528(b)(3) ["After an order dismissing review, the Court of Appeal opinion remains unpublished unless the Supreme Court orders otherwise."].)

In sum, we conclude the trial court properly refused to instruct on self-defense because there was no substantial evidence to support such an instruction.

2. *There was no prosecutorial misconduct.*

Gutierrez contends his conviction must be reversed because the trial court failed to sustain his objections to acts of prosecutorial misconduct during closing argument. This claim is meritless.

a. *Background.*

During Gutierrez's closing argument, defense counsel tried to convince the jury Gutierrez hit Lopez with the rock only because Juarez had been beating him. Because all the eyewitnesses testified Juarez had not touched Gutierrez, defense counsel relied on background sounds from the 911 tapes. For instance, noting that at one point Roman could be heard telling Juarez to leave Gutierrez alone, defense counsel told the jury: "Something's going on. You folks are an astute group of people. You know that more than just harsh words were being said. She's not saying, don't hurt his feelings with your harsh words and your serious looks. . . . She's yelling . . . because she wants [Juarez] to stop beating [Gutierrez]." The prosecutor's "improper argument" objection was overruled.

9

Defense counsel also argued: " . . . Juarez feels the need to say, I never touched him. And that can only be because he touched him before. We know he touched him before. We know when [Roman] was saying, enough, stop, let him leave, [Juarez] was already grabbing him. [Juarez] was already beating him. That has to be the reason why." "His family is covering up for whatever it was that happened on that second phone call, folks." "Listen to the background, because it does not jive with what they said was happening, where nobody was touching anybody, no weapons were used." The prosecutor's objection was again overruled. Finally, defense counsel told the jury: "Let's say Mr. Gutierrez did hit [Lopez] – and I'm certain she got hit, but the reason [*sic*: question] is why." "If he's trying to defend himself, if he's trying to get away, if he's trying to create a distraction so he can run; if he's just trying to slow [Juarez] down and by accident hits [Lopez], then he is not trying to commit an assault with the intent, with force likely to produce great bodily injury."

In rebuttal, the prosecutor argued the defense was trying to sneak in an illegitimate self-defense claim in the context of discussing Gutierrez's motive: "[I]t's actually not relevant and it's not something that you should consider at all . . . because of this important word that we went over during jury instructions, which is motive. [¶] The People are not required to prove that the defendant had a motive to commit any of the crimes charged. And so when defense attorney gets up here and says if you have questions, if you . . . don't know why, then he's not guilty, that's absolutely misleading. Absolutely. We went over [that] during jury selection[.]" Defense counsel's "improper argument" objection was overruled and the prosecutor continued: "That's . . . why you guys were picked, that you guys were okay with not needing to know the why. Why did he pick Ms. Lopez? Why did he pick this apartment complex? Again, a complete stranger. Why did he come over with a rock in his sock? That doesn't mean he's not guilty at all. What we know is that he hit Ms. Lopez with this rock."

The prosecutor then argued: "And the one word that [defense counsel] did not use was self-defense, and the reason why she didn't use it is because you cannot consider it. It is not part of the jury instructions." After defense counsel's objection was overruled:

10

"[Prosecutor]: There is a whole separate instruction set for self-defense.

"[Defense counsel]: Objection. She's misstating the law.

"The Court: Overruled.

"[Prosecutor]: And that instruction set is [not] in front of you. . . . [T]hat word is not gonna come up at all. And that is a decision that was made beforehand.

"[Defense counsel]: Objection. Your Honor. Improper argument."

At this point, the trial court reminded the jury that "evidence is what comes from the witnesses in the witness box. Statements of both counsel during closing arguments are not evidence. . . . [¶] . . . If their statements . . . differ relating to the law from my instructions, you are to follow my instructions."

> b. *Legal principles.*

"Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights – such as a comment upon the defendant's invocation of the right to remain silent – but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.]" (*People v. Riggs* (2008) 44 Cal.4th 248, 298.)

" ' "[T]he prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom." ' [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 752.) "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's

11

statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

   c. *Discussion.*

Gutierrez contends there was misconduct because "the prosecutor erroneously told the jury that self defense was legally irrelevant and that jurors could not consider it *for any purpose at all*," and because the prosecutor "erroneously told the jury that motive was also legally irrelevant."

Gutierrez argues his "motive in flinging the rock [was] probative on the question of the amount of force he [is] likely to have used . . . ." "[I]f appellant believed that he needed to act in self defense . . . the fact that he was motivated by a perceived need to defend himself . . . would still create a strong inference that he used less force than would have been used if he were deliberately trying to harm someone. Indeed, this is precisely what defense counsel argued" when she suggested "if he's just trying to slow [Juarez] down and by accident hits [Lopez], then he is not trying to commit an assault with the intent, with force likely to produce great bodily injury." "The prosecutor improperly removed this argument, which was appellant's *main defense*, from the jury's consideration with [the] two misstatements of law." (Italics added.)

This is simply incorrect. Gutierrez's "main defense" was his claim Lopez and her family lied about what happened in order to cover up for the fact Juarez had beaten Gutierrez, which caused Gutierrez to swing the rock in self-defense and accidentally hit Lopez. Moreover, as explained *ante*, there was no substantial evidence Gutierrez believed he needed to act in self-defense.[4]

---

[4]     Gutierrez also asserts that, even if he were not entitled to a self-defense instruction, "he was still entitled under United States Supreme Court precedent to argue that the evidence that he was motivated by self defense created a strong inference that the force he used was unlikely to produce great bodily injury and that the prosecution therefore failed to sustain its burden of proof with respect to this required element." But the case Gutierrez relies on to support this assertion, *Martin v. Ohio* (1987) 480 U.S. 228 [107 S.Ct. 1098], is inapposite. *Martin* involved the constitutionality of a state law which imposed on defendants the burden of proving self-defense, in a case where the jury

12

We agree with the Attorney General's argument: "Although the trial court had found that no evidence had been presented to support an instruction on self-defense, defense counsel repeatedly implied during argument that appellant had acted in self-defense, and thus should be acquitted." "All the prosecution did in final summation was remind the jury of three undisputed truths: First, the prosecutor reminded the jury that . . . defense counsel's speculation about fending off an attack was not 'evidence' and therefore could not be considered. . . . [¶] Second, the prosecutor correctly stated that motive was not an element of any charged offense, and thus the prosecution did not need to prove why appellant did what he did. . . . [¶] Third, the prosecutor properly reminded the jury that they were not to consider the affirmative defense of self-defense when deciding whether appellant was guilty of the charged crimes. [Because] defense counsel had speculated at length that appellant might have acted in self-defense, it was not improper for the prosecutor to refocus the jury on the limits of their task – to decide the matter using only the evidence and the court's instructions."

There was no prosecutorial misconduct in this case.

3. *There was no cumulative error.*

Gutierrez contends that, even if harmless individually, the cumulative effect of these claimed trial errors mandates reversal of his convictions. Because we have found no errors, his claim of cumulative error fails. (See *People v. Seaton* (2001) 26 Cal.4th 598, 639; *People v. Bolin* (1998) 18 Cal.4th 297, 335.)

4. *Prior juvenile adjudication properly triggered Three Strikes law.*

The trial court used a prior juvenile adjudication to double Gutierrez's prison term under the Three Strikes law (§ 667, subd. (b)-(i)). Gutierrez contends this was impermissible because he did not have the right to a jury trial in the juvenile proceeding. This claim is meritless.

---

was instructed on self-defense after the defendant testified she had shot her husband to death, following an argument, because he "came at her, and she lost her head." (*Id*. at p. 231.) *Martin* tells us nothing we need to know in order to resolve Gutierrez's case.

Gutierrez acknowledges our Supreme Court held in *People v. Nguyen* (2009) 46 Cal.4th 1007, that use of a juvenile adjudication to increase a defendant's sentence under the Three Strikes law was proper. He contends, for federal preservation-of-issues purposes, that *Nguyen* was wrongly decided. We must, of course, follow *Nguyen*. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

5. *Section 4019 was properly applied, but the presentence custody credits were miscalculated.*

Gutierrez contends he was entitled to additional presentence custody credits. The Attorney General agrees there was a calculation error and that Gutierrez is entitled to an additional 18 days presentence custody credits. However, the Attorney General contests Gutierrez's claim he was entitled to additional credits under one of the many amendments to section 4019. The Attorney General is correct.

a. *Trial court made an 18-day calculation error*.

Gutierrez was arrested on June 19, 2011, and sentenced on December 7, 2011. The trial court awarded him 160 days of actual presentence custody, whereas the correct number should have been 172 days. If his conduct credits were properly calculated at the rate of two days credit for every four days served, this would amount to an additional 18 days credit. "Presentence custody credit is calculated under section 4019 ' "by dividing the number of days spent in custody by four and rounding down to the nearest whole number. This number is then multiplied by two and the total added to the original number of days spent in custody. [Citation.]" [Citation.]' [Citation.]" (*People v. Philpot* (2004) 122 Cal.App.4th 893, 908.)

"A sentence that fails to award legally mandated custody credit is unauthorized and may be corrected whenever discovered. [Citation.]" (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647; see also *People v. Acosta* (1996) 48 Cal.App.4th 411, 428, fn. 8 ["The failure to award an adequate amount of credits is a jurisdictional error which may be raised at any time."].) We will order the judgment modified to correct this error.

14

b. *Gutierrez was not entitled to one-for-one conduct credits for part of his time in presentence custody.*

Gutierrez contends he is entitled to additional presentence custody credits under a recent amendment to section 4019. This claim is meritless.

(1) *Amendments to section 4019.*

Under section 2900.5, a defendant sentenced to state prison is entitled to credit against the term of imprisonment for all days spent in custody before sentencing. (§ 2900.5, subd. (a).) In addition, section 4019 permits a defendant to earn additional presentence credit for good behavior and work performance. (§ 4019, subds. (b), (c).) The credits authorized by section 4019 collectively are referred to as conduct credit. (*People v. Dieck* (2009) 46 Cal.4th 934, 939, fn. 3.) The version of section 4019 in effect at the time Gutierrez was sentenced to state prison allowed for six days of conduct credit for every four days of custody (also referred to, hereafter, as the "one-for-two" rate).

Effective January 25, 2010, an amended version of section 4019 permitted defendants to earn conduct credits at twice the previous rate, that is, up to four days of custody credit for every two days of custody (also referred to, hereafter, as the "one-for-one" rate). (Former § 4019, subds. (b)(1), (c)(1), (f); Stats. 2009-2010, 3d Ex. Sess., ch. 28 (S.B.18), § 50, eff. Jan. 25, 2010.) However, effective September 28, 2010, the statute was rewritten to again award conduct credit at the one-for-two rate. (§ 4019, subds. (b), (c), (f); Stats. 2010, ch. 426 (S.B.76), § 2, eff. Sept. 28, 2010.)

Effective October 1, 2011, the statute was amended yet again as part of the Criminal Justice Realignment Act of 2011. "Assembly Bill No. 1X 17 is the current version of section 4019. Assembly Bill No. 1X 17 again retained the enhanced conduct credit provision – four days is deemed to have been served for every two days spent in actual custody. (§ 4019, subd. (f).) As relevant here, section 4019, subdivision (h) . . . provides: 'The changes to this section enacted by the act that added this subdivision shall apply prospectively and shall apply to prisoners who are confined to a county jail, city jail, industrial farm, or road camp for a crime committed on or after October 1, 2011. Any days earned by a prisoner prior to October 1, 2011, shall be calculated at the

15

rate required by the prior law.' " (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 49-50.)

(2) *The statute does not entitle Gutierrez to additional credits.*

Gutierrez argues that in *People v. Brown* (2012) 54 Cal.4th 314, "the California Supreme Court addressed whether changes to the presentence custody credit formula in section 4019 apply retroactively and held that they do not. As part of its analysis, the court explained that the prospective application of favorable changes to a presentence custody credit formula, correctly applied, results in the award of credits at two different rates for those prisoners whose presentence custody takes place over a period of time during which more than one formula applied: [¶] 'To apply [the changes to] former section 4019 prospectively necessarily means that prisoners whose custody overlapped the statute's operative date (Jan. 25, 2010) earned credit at two different rates.' " According to Gutierrez: "Under *Brown*, the default rule is thus that favorable changes to the section 4019 credit formula apply prospectively to defendants, like appellant, who committed their crimes before the effective date of the statute. As a result, the time spent in presentence custody prior to October 1, 2011, is calculated at the one-for-two rate and the time spent on and after October 1, 2011, is calculated at the one-for-one rate."

Gutierrez is wrong. *Brown* did not decide whether any changes at all to section 4019's presentence custody credit formula apply retroactively. *Brown* merely addressed whether one specific version of section 4019, the version operative on January 25, 2010, was retroactive and explained how the proper prospective application of that version could result in awarding credits at two different rates. The question here, however, is the prospective application of a *different* version of section 4019. The version of section 4019 at issue in *Brown* did not contain any express direction from the Legislature regarding which defendants would be able to earn conduct credits at the enhanced rate. In the version of section 4019 at issue here, subdivision (h) specifically provides: "*The changes to this section* enacted by the act that added this subdivision shall apply prospectively and *shall apply to prisoners who are confined . . . for a crime committed on or after October 1, 2011*. Any days earned by a prisoner prior to

16

October 1, 2011, shall be calculated at the rate required by the prior law." (Italics added.) Hence, Gutierrez "is not entitled to enhanced conduct credits for time served on or after October 1, 2011, because he committed his crime before the effective date." (*People v. Rajanayagam, supra,* 211 Cal.App.4th at p. 51; accord *People v. Miles* (2013) 220 Cal.App.4th 432, 436 [for defendant whose crime was committed before October 1, 2011, presentence conduct credit is calculated at one-for-two rate because "[t]he Legislature expressly made the enhanced custody credit prospective, applicable to only those defendants who committed their offense on or after October 1, 2011"]; *People v. Ellis* (2012) 207 Cal.App.4th 1546, 1553 ["the Legislature's clear intent was to have the enhanced rate apply *only* to those defendants who committed their crimes on or after October 1, 2011"].)

Under section 4019, Gutierrez is not entitled to earn custody credits at the one-for-one rate for the portion of his presentence custody he served on or after October 1, 2011.

(3) *The statutory scheme does not violate equal protection.*

Alternatively, Gutierrez contends that if subdivision (h) of section 4019 "is intended to limit the application of the more favorable formula to defendants whose current offenses were committed on or after October 1, 2011, the classification that is created by such an interpretation violates the equal protection clauses of the state and federal constitutions." This claim is meritless.

" 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.]" (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1199.) "Under the equal protection clause, we do not inquire 'whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged." ' [Citations.]" (*Id.* at pp. 1199-1200.) "If persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold." (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1155.)

17

The Attorney General argues these two groups of prisoners, those committing crimes either before or after October 1, 2011, are not similarly situated because *Brown* concluded "the two groups at issue with respect to that amendment were not similarly situated because the defendants who served time prior to January 25, 2010, 'could not have modified their behavior in response [to the statute's amendment].' The same is true with respect to the October 1, 2011, amendment." But this does not follow. In *Brown*, the "first group" consisted of prisoners who had finished serving their presentence custody *before* the new amendment to section 4019 took effect and whose behavior, therefore, could not have been modified in reaction to the amendment. Here, a portion of Gutierrez's presentence custody was served *after* the amendment took effect on October 1, 2011, so for that period he could have modified his behavior in hopes of earning enhanced custody credits. As *People v. Rajanayagam, supra,* 211 Cal.App.4th at p. 54, pointed out: "*Brown* is inapposite on this point as it did not involve a situation where a defendant sought enhanced conduct credit for time served after the amendment's operative date."

Hence, "[b]ecause we conclude the two groups in question are similarly situated for purposes of the October 1, 2011, amendment, we must determine whether the classification bears a rational relationship to a legitimate state purpose." (*People v. Rajanayagam, supra,* 211 Cal.App.4th at p. 54.) "With respect to the judicial scrutiny of the classification, we must determine whether there is any reasonably conceivable state of facts that could provide a rational basis for the classification. It is undisputed the purpose of section 4019's conduct credits generally is to affect inmates' behavior by providing them with incentives to work and behave. [Citation.] But that was not the purpose of Assembly Bill No. 109, which was part of the Realignment Act. . . . [The] Legislature's stated purpose for the Realignment Act 'is to reduce recidivism and improve public safety, while at the same time reducing corrections and related criminal justice spending.' [Citation.] Section 17.5, subdivision (a)(7), puts it succinctly: 'The purpose of justice reinvestment is to manage and allocate criminal justice populations more *cost-effectively*,

18

generating savings that can be reinvested in evidence-based strategies that increase public safety while holding offenders accountable.' (Italics added.)" (*Id.* at pp. 54-55.)

In a careful analysis, *Rajanayagam* concluded the statutory classification does bear a rational relationship to cost savings: "[I]n choosing October 1, 2011, as the effective date of Assembly Bill No. 109, the Legislature took a measured approach and balanced the goal of cost savings against public safety. The effective date was a legislative determination that its stated goal of reducing corrections costs was best served by granting enhanced conduct credits to those defendants who committed their offenses on or after October 1, 2011. To be sure, awarding enhanced conduct credits to everyone in local confinement would have certainly resulted in greater cost savings than awarding enhanced conduct credits to only those defendants who commit an offense on or after the amendment's effective date. But that is not the approach the Legislature chose in balancing public safety against cost savings. [Citation.] Under the very deferential rational relationship test, we will not second-guess the Legislature and conclude its stated purpose is better served by increasing the group of defendants who are entitled to enhanced conduct credits when the Legislature has determined the fiscal crisis is best ameliorated by awarding enhanced conduct credit to only those defendants who committed their offenses on or after October 1, 2011." (*People v. Rajanayagam, supra,* 211 Cal.App.4th at pp. 55-56.)

Gutierrez suggests alternative proposals for how the Legislature could have structured the amended statute in order to be more favorable to prisoners in his position. But the ability to conceive of other rational schemes will not save an equal protection claim. As *People v. Kilborn* (1996) 41 Cal.App.4th 1325, explained while discussing the structure of the Three Strikes law: "Appellant's argument, on analysis, is that persons in his situation (a nonserious or violent present felony) should be *exempted* from application of the new law. Exempting them was a legislative option, obviously rejected by the Legislature and by the people. The system of imposing greater punishment on *all* persons who commit a felony-grade crime after having committed one or more serious or violent felonies in the past, is rationally related to the legitimate public objective of

19

discouraging recidivism.  There are certainly many ways to achieve that objective, but selection among alternatives is a peculiarly legislative task.  The selection in this case is rational, and we uphold it." (*Id*. at pp. 1331-1332.)

Gutierrez was not entitled to earn a portion of his presentence custody credits at the one-for-one rate.

## DISPOSITION

The judgment is affirmed as modified.  The judgment is modified to grant Gutierrez an additional 18 days presentence custody credit.  The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment.  In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KLEIN, P. J.


We concur:



CROSKEY, J.



ALDRICH, J.

20